IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 5, 2024 Session

**IN RE ESTATE OF WILLIAM RUCKER**

**Appeal from the Circuit Court for Davidson County**
**No. 20P1068 Amanda Jane McClendon, Judge**

_____

**No. M2023-01120-COA-R3-CV**

_____

Following the Decedent's death, no original will could be found. One of his daughters filed a petition to administer a copy of a lost will, which the trial court granted. We reverse, concluding the evidence does not overcome the strong presumption in favor of revocation of the lost will.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

JEFFREY USMAN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Jonathan Williams and Gregory Hazelwood, Nashville, Tennessee, for the appellant, Bettye Rucker.[1]

**OPINION**

William Rucker died on June 3, 2020, after an extended hospitalization related to COVID-19 complications. He was survived by his wife, Bettye Rucker, and two daughters, Nedra Rucker and Terra Rucker.[2] At the time of his death, the Decedent had been separated from Bettye for at least 10 years, living alone in a house on Taylor Road that had previously belonged to his mother. He was the sole owner of this home. He also owned a home on Edmondson Pike as a tenant by the entirety with Bettye. A third home on 24th Avenue was previously owned by the Decedent and Bettye but was transferred by deed to Terra. The Decedent also owned personal property, the value of which is not yet known.

---

[1] No other parties submitted briefs or participated in oral argument.

[2] To avoid confusion, we refer to Bettye, Nedra, and Terra Rucker by their first names. We intend no disrespect to any of these individuals by the use of first names.

The Decedent also apparently had another daughter, Todgie Rucker Vu. In July 2020, Todgie[3] filed a petition for testamentary letters for the estate of the Decedent. Todgie attached a copy of a 2017 Will purportedly executed by the Decedent that left all of his property to her. Bettye states she was unaware of Todgie's existence or her alleged relation to the Decedent before the filing of her petition. Bettye filed a response asking that Todgie be required to prove that she was a natural-born daughter of the Decedent. Bettye also filed a petition for letters of administration, asserting that no original or copy of a will was found, and therefore, the estate would pass intestate. The court granted Bettye's petition.

After a November 2022 trial on the issue of whether Todgie could establish the Decedent's paternity, the trial court entered an order stating that Todgie had not met her burden and failed to establish paternity. In February 2023, Todgie filed a new petition to administer the 2017 Will. As with her original petition, she included a copy of the 2017 Will that would leave everything to her. In June, the court held a trial on the petition to administer the lost will. The primary evidence at trial was the testimony from several witnesses, including the Decedent's brother, John Rucker; his friend and colleague, Joanna Johnson; his niece, Vivian Smith; his daughters Nedra and Terra; and the petitioner, Todgie. Bettye did not testify.

While Bettye, Nedra, and Terra all assert that they knew nothing about Todgie, others who knew the Decedent had been aware of her for many years. Though he lived in Detroit, the Decedent's brother, John Rucker, had a close relationship with the Decedent. The Decedent spoke to John[4] about Todgie regularly and said he wanted to make sure she was taken care of after he passed. In early 2020, the Decedent visited John in Detroit where they discussed his plan to give the Taylor Road home to Todgie. John advised the Decedent to make sure that was in a will, to which the Decedent said that he "had a will done." John's understanding from communicating with his brother was that everything besides the Taylor Road home would go to the Decedent's wife and other children. Similarly, Joanna Johnson, a friend who knew the Decedent in the last couple of years of his life, also spoke to him about Todgie. Ms. Johnson drove the Decedent, whose truck was not working at the time, to an attorney's office in early 2020 because he wanted to obtain a copy of a will and make some changes to his will. Ms. Johnson dropped him off and when the Decedent returned to the vehicle, he had some papers with him. She did not know specifically what the papers were. The visit to the attorney's office took significantly longer than Ms. Johnson had anticipated. The Decedent had also discussed with her his desire for Todgie to receive the Taylor Road home. When she told him to make sure he gave it to her in his

---

[3] Maintaining consistency with our first name references to Bettye, Nedra, and Terra, we also refer Todgie Rucker Vu by her first name. We intend no disrespect by use of her first name.

[4] To avoid confusion, we refer to Mr. William Rucker's brother John Rucker as John. We intend no disrespect by the use of his first name.

will, he responded that "he did that." The Decedent's niece, Vivian Smith, who was close in age to the Decedent and raised like a sibling to him, knew Todgie and also stated that the Decedent wanted his three daughters to be treated equally when he died. The Decedent told Ms. Smith that he wanted Todgie to have the Taylor Road home.

Todgie testified that the Decedent had mentioned a will to her, but all she knew about it was that it included the Taylor Road home. At some point, the Decedent told her he moved the will somewhere safe, and Todgie believed based upon the conversation that meant his safety deposit box. However, after the box was opened by court order in the presence of the parties, no will was found. No will was found in his Taylor Road home, either. The Decedent had apparently told Todgie to contact two attorneys about his will upon his death: Sheryl Guinn and Joy Kimbrough. Todgie contacted Ms. Guinn, who provided the copy of the 2017 Will. Todgie testified that she did not remember exactly what happened when she called Ms. Kimbrough. Ms. Smith, however, testified that the Decedent had told her that he had his will with attorney Joy Kimbrough, who was working on the will. The Decedent's other daughters, Nedra and Terra, both testified that they could not locate an original will. No original has been located.

The trial court entered its final order on July 25, 2023. It admitted the lost will to probate, having concluded that Todgie met her burden of showing that the Decedent had not revoked the 2017 Will before his death. The trial court stated,

> Given the way the real properties at issue are held, the Will accomplishes what the Decedent set out to do upon his death; provide for his daughters equally.

The court elaborated on this statement,

> The practical effect of the Lost Will being admitted to Probate is the real property at 5454 Edmondson Pike shall pass to Bettye Rucker as she owned the property with William Rucker as tenants by the entirety. The improved real property at 2013 24th Avenue N. belongs to Terra Rucker by prior conveyance by Bettye Rucker and the Decedent William Rucker. The remaining real and personal property shall pass in accordance with the Will of the Decedent William Rucker to Todgie Rucker Vu. The value of the personal property is unknown at this time.

Bettye appealed, arguing that the trial court erred in admitting the lost will to probate.

## II.

We review the trial court's findings of fact de novo with a presumption of correctness, and we honor those findings unless the evidence preponderates to the contrary.

*In re Estate of Cook*, No. W2018-01766-COA-R3-CV, 2019 WL 2323903, at \*1 (Tenn. Ct. App. May 31, 2019) (citing *In re Estate of Leath*, 294 S.W.3d 571, 574 (Tenn. Ct. App. 2008). The trial court's conclusions of law are reviewed de novo and are not accorded a presumption of correctness. *In re Estate of Leath*, 294 S.W.3d at 575.

III.

On appeal, Bettye argues that the trial court erred in admitting the 2017 Will to probate for two primary reasons.[5] First, she argues that the trial court applied the wrong standard to the case. Rather than applying a presumption that the 2017 Will was revoked and requiring Todgie to overcome the burden of rebutting that presumption, she argues that the trial court instead applied the burden to Bettye to show that it had been revoked. She also argues that the evidence was insufficient to overcome the presumption that the Decedent revoked his 2017 Will. We address these arguments together.

"A party seeking to establish a lost will must demonstrate 1) that the testator made and executed a valid will and that the testator is no longer living; 2) the substance and contents of the missing will; 3) that the will cannot be found after diligent search; and 4) that the will was not revoked by the Decedent." *In re Estate of Leath*, 294 S.W.3d at 575 (citing *Pritchard on the Law of Wills and Administration of Estates* § 51 (5th ed. 1994)). The party seeking to establish a lost will bears a "heavy burden of proof." *Id.* When a will cannot be found after the testator's death, "there is a strong presumption that it was destroyed or revoked by the testator . . . ." *Id.* (citing *Pritchard on the Law of Wills and Administration of Estates* § 51 (5th ed. 1994)). Overcoming this presumption is not an "impossible barrier." *In re Estate of Brown*, No. 01A01-9809-PB-00471, 1999 WL 802718, at \*11 (Tenn. Ct. App. Oct. 7, 1999). However, where a will "has been lost or destroyed, the person seeking to set it up labors under a severe handicap. Doubtless this is due to the fear that a more elastic rule might bring about more fraud than it would prevent." *Sanders v. McClanahan*, 442 S.W.2d 664, 667 (Tenn. Ct. App. 1969) (citing *Haven v. Wrinkle*, 195 S.W.2d 787, 793 (Tenn. Ct. App. 1946)). A petitioner "seeking to show that a lost will was not revoked by the testator must do so by presenting 'the clearest and most stringent evidence' or 'clear, cogent and convincing proof.'" *In re Estate of Leath*, 294 S.W.3d at 575-76 (citing *Shrum v. Powell*, 604 S.W.2d 869, 871 (Tenn. Ct. App. 1980)).

In *In re Estate of Roggli*, this court addressed a reviewing court's role in determining whether the facts presented meet this standard:

---

[5] Bettye also briefly argues that the trial court erred in admitting the 2017 Will to probate when it was never entered into evidence. However, she provides no legal argument or other explanation for why this was a reversible error. Therefore, we find this issue waived. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

While it rests primarily with the trial court to determine whether the evidence is clear, cogent, and convincing, its finding is not conclusive. In reviewing such cases, it is the duty of the appellate court to determine, not whether the trier of facts could reasonably conclude that it is more probable that the fact to be proved exists than that it does not, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists.

*In re Estate of Roggli*, No. M2016-02562-COA-R3-CV, 2017 WL 4331040, at *3 (Tenn. Ct. App. Sept. 28, 2017) (citing *Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 534 (Tenn. Ct. App. 2001)). "The essential issue for us in this case, therefore, is whether the proof established that it is 'highly probable' that the . . . will was not revoked by the Decedent." *In re Estate of Cook*, No. W2018-01766-COA-R3-CV, 2019 WL 2323903, at *2 (Tenn. Ct. App. May 31, 2019).

Here, in its final order, the trial court laid out the elements Todgie was required to meet. The trial court concluded that there was no dispute that the copy of the 2017 Will was authentic, as none of the evidence, witnesses, or parties disputed its authenticity. The trial court stated that, because its authenticity was uncontested, it was unnecessary for the court to address the validity of the will or its contents. The trial court also stated that there was no dispute as to the fact that no original will was found after a diligent search. Accordingly, the trial court's focus was solely upon the final element of whether the Decedent revoked his will. *See In re Estate of Leath*, 294 S.W.3d at 575.

In analyzing the evidence as to whether the Decedent revoked his will, the trial court stated that the Decedent had referenced a will several times to various witnesses and made it clear that he wished to provide for his daughters equally. The trial court also stated that the Decedent "had several opportunities to revoke his Will," but failed to do so. The trial court stated that "at no point during all of this is the intent to revoke present by the Decedent." Based on this lack of intent, the trial court concluded that the Decedent "intended for this Will to remain in effect."

On appeal, Bettye argues that the trial court failed to properly apply the presumption in favor of revocation, which is a heavy burden for a petitioner to overcome. *See In re Estate of Leath*, 294 S.W.3d at 575 (citing *Pritchard on Wills and Administration of Estates*, 5th Ed., § 51). As noted above, the primary question for this court on appeal is whether the proof established that it is highly probable that the lost will was not revoked by the Decedent. *In re Estate of Cook*, 2019 WL 2323903, at *2. This is meant to be a "severe handicap" for the party seeking to administer a lost will. *Sanders*, 442 S.W.2d at 667 (quoting *Haven*, 195 S.W.2d at 793). There is a "heavy burden of proof", and the presumption of revocation can only be overcome by 'by presenting 'the clearest and most stringent evidence' or 'clear, cogent and convincing proof.'" *Id.*

Based on the evidence presented at trial, we cannot agree that Todgie satisfied that

- 5 -

demanding burden and established that it is "highly probable" that the Decedent failed to revoke his will. The lost will at issue in this case was apparently created in 2017. The testimony indicates, however, that the Decedent went to an attorney's office in early 2020 to pick up a copy of his will and to make "some changes" to a will, which is three years after the creation of the lost will which Todgie asserts was not revoked. Ms. Johnson, the witness who drove the Decedent to the lawyer's office in 2020 because his truck was not working that day, indicated that changes to the will were one of the purposes of the trip to the lawyer's office and that the trip took longer than she anticipated while she waited for the Decedent to finish his appointment and drive him home. Although no precise indication was given as to timing, Ms. Smith similarly testified that the Decedent had attorney Joy Kimbrough "working on" his will. As the trial court points out, in 2020 the Decedent referenced having a completed will to multiple witnesses that would specifically give the Taylor Road home to Todgie.

The evidence from the witnesses indicates that the Decedent did not have an intent to give everything he had to Todgie, only the Taylor Road home. The Decedent's brother specifically indicated that it was the "property on Taylor Road" that the Decedent wanted Todgie to receive and that, other than that property, the other daughters would have "whatever else." With regard to personal property, the 2017 Will, however, provides:

> I bequeath and devise all of my property including cash, stocks, bonds, bank accounts, investments, and any other item that I have an interest in or is in my name to my daughter Tod-gie Danielle Rucker Sherrill. I bequeath and devise any remainder of my estate to my daughter Tod-gie Danielle Rucker Sherrill.[6]

There was no testimony that the Decedent wanted Todgie to have the entirety of all of his personal property. To the contrary, the testimony at trial indicated that the Decedent wanted the three daughters treated equally. Ms. Smith, specifically, testified the Decedent "made it very plain" that it was important to him to have his daughters treated equally. The 2017 Will, however, expressly gives all personal property to Todgie and provides nothing to his other daughters. The 2017 Will also expressly gives Todgie the 5454 Edmondson Pike, and 2013 24th Avenue North, Nashville properties. No witness expressed any indication that the Decedent intended to give these properties to Todgie. Insofar as his intent can best be derived from the witnesses, the Decedent's expressed intent to family and friends appears to conflict with the 2017 Will, which gives everything to Todgie, including property, both personal and real. In other words, the 2017 Will gives property to Todgie that no witness indicated the Decedent intended to confer upon her.

---

[6] There is some confusion in the record in connection with the use of the last name Sherrill as Todgie seemingly did not ever legally change her name, but it appears that the name may have been her married name informally prior to her divorce.

The trial court accepted the consistent testimony of witnesses that the Decedent wanted his daughters to be provided for in an equal manner. Working around this complication with the 2017 Will, the trial court explained that the Decedent "provided for [(Nedra and Terra)] prior to his death then his Will seeks to provide for Todgie to make things equal." This is entirely possible. This explanation fails to grapple, however, with the fact that the Decedent also provided support for Todgie prior to his death.

Furthermore, based upon a conversation that Todgie had with the Decedent, she believed that he was placing his will in his safe deposit box at a bank. The Decedent was seemingly the only one with access to the safe deposit box. After his death, no key was located, so the box was opened using a drill with all parties present in a represented or personal capacity. No will was found inside. Nor was any will located in the Decedent's home. The nature of every lost will case is that the will is not found, but when there is an understanding that a will is to be found in a particular place that only the Decedent had access to and the will is not there, such evidence is unhelpful to a party seeking to prove that no revocation occurred.

More problematic, the trial court failed to fully grapple with how the testimony that in early 2020, months before his unfortunate hospitalization and death, the Decedent was making some changes to his will squared with non-revocation of the 2017 Will. The testimony was clear that the Decedent was meeting with a lawyer in early 2020 to make some changes to his will. The testimony was also clear that he had at least one visit to the attorney's office with such changes being part of the purpose for the visit and that this visit took a significant amount of time. This testimony raises serious concerns about whether he revoked the 2017 Will.

In considering the evidence in this case, it is certainly possible that the Decedent never revoked his 2017 Will. We cannot agree though that the presumption in favor of revocation, a heavy burden which is difficult to overcome, the surmounting of which requires a showing that it is highly probable that the will was not revoked, is satisfied in the present case. The description of the property that he wanted to give Todgie, which the Decedent shared with family and friends, is inconsistent with the 2017 Will. There is testimony that the Decedent was making changes to his will in early 2020, months before his hospitalization and death, and met with a lawyer to accomplish this in early 2020. In the present case, there was some basis for believing the Decedent's will would be in a particular place, the Decedent's bank safe deposit box, and it was not located there with no one other than Decedent seemingly having access to the safe deposit box. Todgie did testify that the Decedent gave her the names of two lawyers to contact in connection with his will, Mses. Guinn and Kimbrough. In response to her communication, Ms. Guinn did provide Todgie with a copy of the 2017 Will; however, Todgie could not recall what happened in her communication with Ms. Kimbrough. Ms. Smith, however, testified that the Decedent indicated to her that Ms. Kimbrough had his will.

We agree with the trial court that this is a sad circumstance for all involved, and it is clear from the record that the Decedent intended for Todgie to have the Taylor Road property. The evidence, however, simply does not rise to the level necessary to overcome the strong presumption that the Decedent revoked the 2017 Will. We must, therefore, reverse the trial court's order granting Todgie's petition to administer the 2017 Will of the Decedent.

## IV.

For these reasons, we reverse the judgment of the trial court. Costs of this appeal are taxed against the appellee, Todgie Rucker Vu, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE